**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JUMP OPERATIONS, LLC,

                    Plaintiff,

        v.

CHASE LOCHMILLER,

                    Defendant.

Case No. 17 cv 5614

## VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF

### Nature of the Case

1.      Jump Operations, LLC ("Jump") seeks a temporary restraining order and preliminary injunction to prevent former employee Chase Lochmiller ("Lochmiller") from breaching a noncompetition agreement (the "Agreement") between him and Jump. Under the Agreement, Lochmiller is barred from engaging in "competitive activity" on behalf of a "competitive entity" through July 6, 2018.

2.      Notwithstanding the Agreement, and the fact that he is being paid $10,000 a month under the Agreement to sit out and honor his noncompete, Lochmiller has been hired by and intends to become an employee of Polychain Capital, LLC ("Polychain"), a Jump competitor, on Wednesday, August 2, 2017. Polychain, like Jump, is in the business of quantitative trading, and, like Jump, trades in the markets for cryptocurrencies, such as Bitcoin. Polychain has hired Lochmiller to engage in competitive activities, including acting in a similar capacity, providing similar services and with similar responsibilities to those he had at Jump and engaging in quantitative analytics similar to those he performed at Jump. This employment constitutes a direct violation of the Agreement.

## Parties

3.     Plaintiff Jump Operations, LLC ("Jump") is organized as a Delaware limited liability company and has its principal place of business in Chicago, Illinois.

4.     Jump is a service provider to its affiliated trading entities. Jump and its affiliated trading entities constitute a proprietary quantitative and research-based trading and technology firm that focuses on developing cutting edge statistical research techniques and tools, and pairing that research with applications and infrastructure to provide traders with a competitive advantage in the financial industry. Jump trades in a variety of equity, futures, currency and derivatives markets worldwide including the market for cryptocurrencies.

5.     Defendant Chase Lochmiller was at all relevant times a citizen of the state of New York and, on information and belief, is or will become a citizen of the state of California on or before August 2, 2017.

## Jurisdiction and Venue

6.     This Court has jurisdiction over the subject matter of the action pursuant to 28 U.S.C. § 1332 in that the defendant is a citizen of either New York or California and the plaintiff is a citizen of Delaware and Illinois, and the amount in controversy exceeds $75,000.

7.     This court has personal jurisdiction over Lochmiller in that he transacted business in Illinois, made and performed contracts substantially connected with the State of Illinois, traveled to Illinois as part of his employment with Jump, was a team member of a trading group primarily based in Chicago, worked with Jump personnel based in Chicago, entered into a noncompetition agreement that specifies Illinois courts as the proper forum for injunctive relief, and otherwise has sufficient minimum contacts with Illinois to warrant the Court's exercise of jurisdiction over him.

2

8.      Venue is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events occurred here as the Agreement was made here and, in part, performed here. Further, Lochmiller agreed to the venue of courts located in this district for any action arising out of the contract.

## Factual Allegations

9.      Jump is in the business of trading derivatives, options, equities, currencies, and a variety of other financial products, including cryptocurrencies, on exchanges and electronic platforms around the world, including exchanges in Chicago, New York, London and Singapore. Its proprietary trading groups create strategies based on algorithms that permit it to trade on various types of market data. Along with a huge and ongoing investment in research and development of these strategies, Jump's business is fundamentally grounded in its intellectual property, including trading strategies and highly-compensated employees who create, maintain, and implement Jump's proprietary infrastructure and strategies.

10.      Jump's ability to run its business profitably depends on its ability to keep secret its trading strategies, technology, trading infrastructure, algorithms, proprietary data, order placement and quote logic and research. Knowledge of Jump's strategies, trading signals, research, order placement and order quote logic, as well as Jump's proprietary understanding of the microstructure of the markets that Jump trades in, are essential to Jump's competitive advantage in the markets. Knowledge of Jump's predictive signals, research, order placement and order quote logic and microstructure understanding in one market are generalizable and transferable to other markets. If a competitor were to learn of or be exposed to such confidential data, Jump's ability to trade profitably would be diminished, causing injury to Jump.

11.     Due to the value of this information, Jump devotes substantial resources to sophisticated security mechanisms to protect its confidential and proprietary information and ensure its trade secrets and other intellectual property are not disclosed.

<u>The Noncompete Agreement</u>

12.     Jump, like others in the financial industry, also enters into agreements with its employees not only to directly bar the release of confidential information, but also to restrict competitive activity for a short period of time after an employee leaves Jump in order to ensure the security and integrity of its intellectual property. In return, Jump not only provides access to its proprietary information and infrastructure to those employees, but also provides monetary payments for the duration of the noncompetition period.

13.     Lochmiller is well-acquainted with industry norms regarding noncompetition agreements. He previously worked at one of the world's largest algorithmic trading firms, Getco, where he signed and was bound by such an agreement.

14.     Lochmiller accepted Jump's offer of employment as a member of one of Jump's trading teams on November 11, 2013. His employment at Jump began on May 27, 2014 in Jump's New York office following the expiration of his Getco noncompetition agreement.

15.     Also on November 11, 2013, Lochmiller entered into a Noncompetition Agreement with Jump. The Agreement is attached as Exhibit 1 to this Verified Complaint.  As part of the Agreement, Lochmiller agreed he would "refrain directly or indirectly engaging in Competitive Activity . . . at all times . . . during the Non-Compete period."  Exh. 1, sec. 2.

16.     The "Non-Compete Period" was defined to mean a period between zero and twelve months following the termination of his employment, as elected by the Company.

17.     Section 2.B of the Agreement defines the term "Competitive Activity" as follows:

For the purposes of this Agreement, "Competitive Activity" includes engaging in any of the following activities with or for the benefit of a Competitive Entity:

i. Becoming an employee in a similar capacity, providing similar services, or with similar responsibilities to the services provided by me to the Company; or

ii. Becoming an advisor or consultant in a similar capacity, providing similar services, or with similar responsibilities to the services provided by me to the Company; or

iii. Directly or indirectly utilizing or developing or assisting in the development of quantitative analytics that are similar to or derived from quantitative analytics that I utilized or developed or had access to while I was employed by the Company; or

iv. Preparing to directly or indirectly utilize or develop quantitative analytics that are similar to or derived from quantitative analytics that I utilized or developed or had access to while I was employed by the Company; or

v. Directly or indirectly overseeing one or more individuals that utilize or develop quantitative analytics that are similar to or derived from quantitative analytics that I utilized or developed or had access to while I was employed by the Company; or

vi. Directly or indirectly becoming a partner or principal in, or directly or indirectly forming, or acquiring greater than five percent (5%) equity, voting, revenue, income, profit, loss or other economic interest in, a Competitive Entity.

18. Under Section 2.C., a "Competitive Entity" is defined as any business that:

i. Engages in, or is in the process of developing, or preparing to engage in, any of the trading strategies or any other business activities identical or similar to any of those engaged in by the Company, or

ii. Engages in, or is in the process of developing, or preparing to engage in, high frequency or algorithmic transactions in any way involving any electronically tradeable product or commodity through any exchange, electronic trading venue or platform in which the Company engaged or evaluated engaging in during the twelve (12) months preceding the Separation Date or in which the Company had plans or was preparing to, but had yet to engage in, as of the Separation Date, or

iii. Engages in, or is in the process of developing, or preparing to engage in the creation of trading software and/or trading applications, or

iv. Owns or controls a greater than five percent (5%) interest in any entity that engages in any of the trading strategies or any other businesses activities identical or similar to those engaged in by the Company.

19.     The Agreement further provides that if Lochmiller "voluntarily terminates the employment relationship, the Company agrees to compensate Employee during the Non-Compete Period at a periodic rate equal to seventy-five percent (75%) of one-twenty-fourth of Employee's total compensation for the one (1) year period prior to termination of employment, excluding compensation from liquidation of any trading account and compensation from any sign on bonus, not to exceed $10,000 per month, provided Employee does not engage in any Competitive Activity for the duration of the Non-Compete Period." *See* Ex. 1, Section 4.C. Under Lochmiller's compensation structure, this equals $120,000.

<u>Lochmiller's Departure</u>

20.     On July 6, 2017, hours before he announced his resignation from Jump, and prior to anyone at Jump being aware of his intent to resign, Lochmiller specifically sought out two high-level Jump personnel, including one of the co-owners of the firm, to pump them for information about Jump's Bitcoin and cryptocurrency trading business.  Later that same day, Lochmiller resigned from Jump.

21.      On July 7, 2017, Jump timely elected a Non-Compete Period and notified Lochmiller that his Non-Compete Period would last 12 months, that is, through July 6, 2018.

<u>Polychain is a Competitive Entity</u>

22.     Jump Trading is a major participant in the quantitative trading business.  Among other financial assets, it trades cryptocurrencies.

6

23.     Polychain is a "Competitive Entity" of Jump's within the meaning of the Agreement. It engages in or is preparing to engage in quantitative trading strategies and other business activities similar to those in which Jump is engaged, including in the market for cryptocurrencies. It also engages in or is preparing to engage in and is developing algorithmic trading strategies in one or more electronically tradeable products. And it uses or is preparing to use and is developing trading software.

24.     Specifically, its website, www.polychain.capital, indicates that "the emergence of bitcoin and subsequent blockchain technologies has generated a new digital asset class in which scarcity is based on mathematical properties" and that Polychain manages a hedge fund "committed to exceptional returns for investors through an actively managed portfolio of [] blockchain assets." (Emphasis added.)

25.     That Polychain is engaged in, preparing to engage in, or developing quantitative and algorithmic trading strategies and developing trading software is evidenced by various job advertisements it has published. Polychain is currently seeking a "trading systems engineer" to "implement 100% of the trade execution for a multi-million dollar cryptocurrency portfolio in a fully automated manner." https://angel.co/polychain-capital/jobs (emphasis added.) At the same site, Polychain has a posting for a "Data Scientist" with responsibility for "extracting and analyzing data from blockchains [and] exchanges . . . to predict cryptocurrency market movements." *Id.* (emphasis added.) That is, in fact, the definition of algorithmic trading strategies.

Lochmiller's activities at Polychain are similar to those he was<br>responsible for at Jump and involve similar algorithmic trading strategies

26.     Lochmiller is preparing to work as a trader of these cryptocurrency assets at Polychain, where he states he will be "responsible for managing the fund operations" for

Polychain, and that he will be involved with "research on new and existing protocols," "execution," "risk management" and "portfolio management" of blockchain asset trading. (See letter of July 27, 2017, attached as Exhibit 2.) This work constitutes a "Competitive Activity" within the meaning of the Agreement, and thus directly violates the Agreement.

27.     Indeed, approximately three months ago, Polychain advertised for the position of "Senior Trader & Portfolio Manager." While Mr. Lochmiller did not state his job title in the notice of future employment he provided to Jump, on information and belief, his position is this "Senior Trader & Portfolio Manager", or is a position substantially similar to it.

28.     The posting stated that the candidate should have a "strong understanding of quantitative trading strategies" and "a strong background in development of algorithmic trading models, advanced quantitative analytics and . . . a breadth of experience in software development for trading and execution."[1] The individual "will be responsible for 100% of the fund's trading and execution of blockchain tokens" and for developing "software such as APIs, quantitative models and algorithms for more efficient trading and execution." *Id.* (Emphasis added.)

29.     The activities and responsibilities of the "Senior Trader & Portfolio Manager" position are the same activities and responsibilities Mr. Lochmiller performed at Jump.

30.     At Jump, Lochmiller was a hybrid between an algorithmic trader and quantitative researcher and was involved in the development and execution of quantitative models and algorithms in equities and futures markets. The signals that comprise Jump's quantitative strategies exploit market microstructure that is common to all central limit-order books. Thus, the strategies that work in one limit-order book market are also generalizable to and useful in other central limit-order book markets, including the markets for cryptocurrencies.

---

[1] https://www.reddit.com/r/ethereum/comments/63iutp/polychain_capital_is_hiring_a_senior_operations/ (Emphasis added.)

31.     Lochmiller's role on his Jump trading team made him responsible for (1) making trading decisions with respect to a variety of financial products such as how much to trade, which symbols and strategies to trade, and when and where to trade based on Jump's proprietary models; (2) meeting with various exchanges' representatives and learning more about their trading infrastructure, order flow, exchange price feeds, order types and messaging protocols and using that knowledge to develop and enhance Jump's strategies; (3) working with researchers to design predictive signals based on trade and order book activity; and (4) customizing order placement and order quoting logic based on Jump's market microstructure knowledge.

32.     While employed by Jump, Lochmiller had access to and was also exposed to highly confidential information and trade secrets through at least (a) discussing strategies and protocols with other Jump personnel; (b) attending meetings with other members of Jump, at which confidential research techniques, trading strategies, and corresponding software and infrastructure for research and trading was discussed; and (c) having computer access to files stored by Jump regarding research, infrastructure, software programs, and trading strategies.

33.     Because Lochmiller will be responsible for managing operations for Polychain, he will necessarily be supervising individuals responsible for researching, developing and implementing trading strategies at Polychain.

34.      Thus, Lochmiller's employment would violate:

a.      Section 2.B.i of the Agreement because he would be employed in similar capacity, provide similar services and have similar (and greater) responsibilities to those provided to Jump for a Competitive Entity;

b.     Section 2.B.iii of the Agreement because he would necessarily be directly or indirectly utilizing or developing or assisting in the development of quantitative analytics similar to those he utilized, developed or had access to at Jump;

c.     Section 2.B.iv by preparing to utilize such quantitative analytics; and

d.     Section 2.B.v of the Agreement by directly or indirectly overseeing one or more individuals that utilize or develop such quantitative analytics.

35.    The Agreement specifically provides that Jump is entitled to seek emergency, temporary and/or preliminary relief and enforcement of the Agreement upon a threatened breach of the Agreement, and to recover attorneys' fees as a result of any such breach.

## Count One:  Breach of Contract

36.    The Agreement constitutes a valid, enforceable contract between Lochmiller and Jump. In addition, the Agreement is supported by a legitimate business interest, is reasonable as to scope, does not impose any undue hardship on Lochmiller and is not injurious to the public.

37.    Lochmiller has breached and is threatening to further breach the Agreement.

38.    Jump has fully performed pursuant to the Agreement.

39.    Jump has suffered or will suffer irreparable injury by the breach of the Agreement in the form, among others, of potential release of highly confidential and proprietary research and trading information to a competitor.

## Prayer For Relief

40.    For these reasons, Jump respectfully prays for the following relief:

a.     A temporary restraining order and preliminary injunction barring Lochmiller, and any other person or entity acting in concert with Lochmiller from working for, consulting or advising Polychain or any affiliate of Polychain, or preparing

10

to do so, in any of the Competitive Activities identified in Section 1.B of the Agreement until the case can be resolved by arbitration;

b. A temporary restraining order and preliminary injunction requiring Lochmiller to destroy all work product, including trading strategies, algorithms, formulas and any notes or outlines relating to such materials created since July 7, 2017 and to certify that he has done so to the Court;

c. Costs and attorneys' fees under Section 9.D of the Agreement; and

d. Such other relief as the Court may deem just and proper.

Dated: August 1, 2017

Respectfully submitted,

JUMP OPERATIONS, LLC

By: /s/ Chris Gair
Chris Gair (ARDC # 6190781)
Thomas R. Heisler (ARDC # 6296712)
Gair Eberhard Nelson Dedinas Ltd.
1 E. Wacker Dr., Suite 2600
Chicago, IL 60601
(312) 600-4900

## **VERIFICATION**

I, Matthew Schrecengost, Chief Operating Officer of Jump , declare under penalty of perjury as provided in 28 U.S.C. §1746, that the foregoing statements set forth in the Verified Complaint are true and correct.

Dated:          August 1, 2017

Matthew Schrecengost